1
2
3
4
5
6
7

8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11  TOMMY COLEMAN,                          )   Case No.: 1:14-cv-01472 JLT
                                           )
12              Plaintiff,                  )   ORDER GRANTING IN PART DEFENDANT'S
                                           )   MOTION FOR SUMMARY JUDGMENT
13         v.                               )
                                           )
14  MIDLANDS CARRIER TRANSICOLD, et         )   (Doc. 22)
    al.,                                    )
15                                          )
                Defendants.                 )
16  _____    )

17

18  **I. Statement of Facts**

19         MCT hired Plaintiff in December 2011 as a refrigeration service technician.  (JUF[1] 2)  MCT

20  services refrigeration equipment for railcars and operates this business in Delano, California.  (JUF 1)

21  As a refrigeration service technician, Plaintiff conducted preventative maintenance and repair on

22  refrigeration units located on railcars.  (JUF 3)  The job required Plaintiff to wear appropriate personal

23  protective equipment while working (JUF 4) and he was required to be aware of MCT's safety policies

24  that were set forth in the company's safety handbook.  (JUF 10)  Plaintiff acknowledged awareness of

25  these policies through a written statement (Id.) and underwent testing to ensure his understanding of

26  the policies.  (JUF 11, 12)

27         Plaintiff's work performance was disappointing to MCT.  (JUF 15; Doc. 25-6; Doc. 25-7; Doc.

28
_____
[1] The Joint Undisputed Facts are found in docket entry 23.

1   25-8; Doc. 25-9; Doc. 25-11)  Multiple times in February 2012, Plaintiff's supervisor, DeMon[2] Level,

2   documented incidents in which Plaintiff's work fell below expectations.  On one occasion, on February

3   8, 2012, Level noted that Plaintiff continued to fail to have the proper tools despite Level telling him

4   what tools were necessary.  (Doc. 25-6)  About a week later, on February 17, 2012, Level noted that

5   Plaintiff repeated the same mistakes when filling out paperwork.  (Doc. 25-7)  When reminded that he

6   simply needed to ask if he was not certain about what to do, he would "always" reply, "Ok, I gotcha,"

7   only to make the same mistakes again.  Id.  On February 20, 2012, Plaintiff failed to perform

8   maintenance on equipment properly and failed to take the car "out of maintenance mode."  (Doc. 25-8)

9   Placing a piece of equipment in "maintenance mode" is a safety requirement because the cars, when not

10  in this mode, can be remotely controlled.  (Doc. 25 at 4) If a car is undergoing maintenance, the sudden

11  movement of the car being controlled remotely could cause significant harm to the people and

12  equipment. Id.  MCT considered Plaintiff's failure to use properly the maintenance mode to be a safety

13  violation. Id. The next day, Level noted that Plaintiff inspected seven units to determine whether they

14  needed repair and, in doing so, performed sloppily, and missed many necessary repairs.  (Doc. 25-9)

15          On the other hand, on February 17, 2012, Plaintiff received a lukewarm compliment from

16  Level in which Level noted Plaintiff had "demonstrated the willingness to tackle major breakdowns

17  and repairs which has at times has led [to] problems."  (Doc. 30-4 at 32)  Level continued, "There has

18  [sic] been instances where repairs were made and componets [sic] were installed incorrectly.  As noted

19  this form is for exceeding expectations and showing drive and the initiative to perform his duties."  Id.

20  However, Level instructed Plaintiff "to keep up the motivation and let him know when he's not

21  positive about something to ask someone."  Id.  Thus, without considering this event, in the month of

22  February alone, Level documented Plaintiff's inadequate work performance four times. (Doc. 25-6;

23  Doc. 25-7; Doc. 25-8; Doc. 25-9; Doc. 25-11)  As a result, MCT management considered whether to

24  terminate Plaintiff but, ultimately, decided to give him more time to make improvements.  (JUF 15;

25  Doc. 25-11)  Nevertheless, Plaintiff's work quality did not improve.  (Doc. 25-10)  Once again, Level

26  reported on Plaintiff's poor work performance on March 1, 2012.  Id

27

28  [2] In the evidence submitted, Mr. Level's first name is spelled sometimes with the "M" capitalized and sometimes without.
    Because it is unclear which method is correct, the Court adopts the spelling with the capitalized letter merely to be
    consistent.

On March 6, 2012, Plaintiff suffered an injury after placing his hand in a running engine.  (JUF 16)  When he reached into the compressor, Plaintiff was attempting to prevent a tool from falling into it and caught his hand on the running belt.  (JUF 26; Doc. 25-5)  The injury required immediate surgery on his hand and caused him to be on disability leave from March 6, 2012 through July 31, 2012.[3]  (JUF 27, 28, 29)  MCT issued him a verbal warning for putting his hand in the operating engine. (JUF 16)  Plaintiff certified that the cause of the injury was his "carelessness."  (Doc. 25-5 at 1)

When he returned to work, Plaintiff's doctor precluded him from lifting more than 20 pounds and restricted him to "limited use of his left hand" though the doctor permitted him to climb ladders.  (JUF 29, 30)  As a result, MCT placed Plaintiff in a light duty, modified position.  (JUF 31)

Again, on August 14, 2012—just two weeks after returning from medical leave—Level saw Plaintiff put his hand in a running to engine to check an exhaust leak.  (JUF 17; Doc. 25-13)  As a result, MCT issued Plaintiff written discipline.  Id.  Though Plaintiff now contends that he had been trained to put his hands into running machines, on the written warning given at the time, Plaintiff noted that placing his hand into an operating engine, "was careless of me.  It won't happen again."  (Doc. 25-13 at 1, 3)  Soon thereafter, MCT suspended Plaintiff for two days after he damaged a toolbox and failed to report the damage.  (JUF 19)  Plaintiff did not deny that he failed to ensure the toolbox was properly secured—which would have prevented the damage—but he minimized the seriousness of his conduct by saying, "[The toolbox] was not severly [sic] bent. It actually slipped my mind. It was not ignored. This is the only thing I failed to report . . .  [T]his was not done willfully. It was totally done by accident."  (Doc. 25-14 at 1, 3)  Nevertheless, the written discipline noted,

> Tommy will be taking a three day suspension due to his careless actions in the past week. He was not only caught performing unsafe duties on equipment but also inflicted damage to company property and failed to notify anyone. This kind of willful neglect of safety to himself and company equipment will not be tolerated. Any further issues relating to safety or damage to company property will result in suspension or even termination.

(Doc. 25-14 at 1)

On September 26, 2012, Level conducted a performance review in which he determined that

---

[3] It appears that Plaintiff may have returned to work on March 20, 2012 but again was returned to medical leave on March 21, 2012.  (JUF 28, 29)

Plaintiff's work quality was "poor" and his safety violations caused concerns.  (JUF 21; Doc. 25-15)

Nearly all of the evaluation contained comments that Plaintiff's performance was "below standard" or

"unsatisfactory." Id.  Level noted on the performance review,

> Tommy has yet to show he can perform the most basic tasks independently. All
> of his work has to be double checked due to his consistent missing of repairs or poor
> craftsmanship when making repairs. Tommy has not shown any initiative or concern
> with getting better at his job. He seems to be complacent with his current skills.
> Tommy has shown very poor retention skills and needs to have the basics explained
> repeatedly. Moving forward it is my hope that Tommy puts forth the effort required to
> be a viable part of the team instead of settling for mediocrity.
> Tommy has been off and on work during his recover from an injury sustained at
> work. During this time Tommy has yet to try and improve his skills and knowledge. I
> will expect him to educate himself as well as request education from the company. If
> Tommy does not take the initiative he will remain in the same position he is now.
> During his time off of work Tommy was unable to retain much of the knowledge taught
> to him while on full duty. This is understandable but is also hard to except [sic]. We
> need Tommy to take the initiative and step up his level of effort in learning.
> Tommy has had a few documented incidents of carelessness resulting in injury
> and damage to company property. These kinds of situations will not be accepted at
> MCT. Tommy will need to rethink his attitude towards company property and safety if
> he plans on continuing his employment with MCT. We work in a very dangerous
> atmosphere and our day to day activities cannot be taken for granted. Safety of our staff
> is our number one concern. Please ensure you are keeping this in mind at all times.
> Due to your current review no pay increase or promotion will be granted. All
> fields will need improvement before any promotions will be considered.

(Doc. 25-15 at 4) On the performance review document, Plaintiff impliedly admitted his shortcomings

and noted, "I will work on improving my performance and quality of work." (Doc. 25-15 at 3; JUF 22)

On October 24, 2012, MCT again issued Plaintiff written discipline when he failed to follow

proper safety procedures after he removed the "blue flag protection" placed by his supervisor.[4]  (JUF

23)  Plaintiff disputed he acted improperly and claimed he had been given permission to remove the

blue flag protection by his supervisor.  Id.  It is undisputed that Plaintiff and Level were attempting to

communicate with hand signals, given Level was some distance away from Plaintiff.  During this

exchange, Plaintiff testified he yelled, "We good?" to which Level made a hand gesture that Plaintiff

understood to mean Level agreed that the blue flag protection should be removed.  (Doc. 30-3 at 69)

Notably, Plaintiff does not claim that at any time during this exchange he gestured to the blue flag or

yelled the words "blue flag."  (Doc. 30-3 at 68-70)  In any event, after the hand-gesture exchange,

---

[4] "Blue flag" protection refers to warnings affixed to rail equipment signaling that workmen are on, under or between rail cars.  (Doc. 30-3 at 105-106)  Such "blue flags" may be removed only by the workmen who placed the flags.  Id. at 106.

Level returned to atop the rail car.  Id. By this time, the locomotive that would have moved the car—

while likely throwing Level off the rail car and causing him significant injuries—began approaching for

the purpose of coupling with the car because Plaintiff had removed the blue flag.  Id. at 95-96.  At the

time, Plaintiff admitted his mistake and indicated it would not recur because in future, he "will make

sure we're on the same page."  Id. at 96.

Proper blue flag protection is an important safety measure.  (Doc. 30-3 at 52).  At his

deposition, when asked what blue flag protection is, Plaintiff testified, "It's a—it's a --some form of

either light or a flag or – that's pretty much the two main ones.  Or a lock-out/tag-out situation, where

it basically protects whoever's working on railcars to prevent the locomotive from connecting onto the

railcars, because there's somebody on there."  (Doc. 36-1 at 2)  Plaintiff continued,

> And if you've ever seen those things hook up, it's, like, violent. It's, like, boom.
> And, you know, if you're standing on a railcar, you can actually fall over. So it was –
> it's like a – almost like a stoplight, but it's blue instead of red. Just letting you know,
> Hey, we got people working on these – this equipment. Do not connect with it. Do not
> do anything with this equipment, so...

Id.

Soon thereafter, Plaintiff's doctor returned him to disabled status and he was on leave until

January 2013.  (JUF 32) About a week after Plaintiff's return to work, on January 18, 2013, MCT

terminated Plaintiff after he operated a forklift without first donning a hard hat.[5]  (JUF 24, 25)  Though

Plaintiff admits he was not wearing a hardhat, he disputes that it was required and whether one

incident of not wearing a hardhat was sufficient grounds for termination.  The former Regional

Manager, Clerc, noted that failing to wear a hardhat was wrong but this "was something almost

everyone did at least once."  (Doc. 30-3 at 92)  Clerc noted that in his six years with the company he

had never found that failing to wear a hardhat on one occasion "alone" would be grounds for

termination.  Id.  Rather, in his experience, at least three such violations would be necessary.  Id.

Plaintiff claims that after returning to work after his injury in August 2012, MTC failed to

accommodate him by requiring him to exceed the limitations imposed by his doctor on several

occasions.  He claims he was required to lift receivers, compressors and batteries that weighed at least

---

[5] The letter terminating Plaintiff's employment read, "I would like to inform you that your position with Midland Carrier
Transicold will be terminated immediately due to multiple safety violations."  (Doc. 25-18)

45, 100  and 48 pounds, respectively.  (PUF 33-35, 37) Likewise, Plaintiff asserts that DeMon Level

required him to repair a water pump and that this required more than limited use of his left hand. (PUF

36)  In addition, he claims DeMon Level made negative comments about his injured status and his

failure to do work.  He claims that one day after a presentation by an Aflac representative, a coworker

commented that Plaintiff should have purchased the coverage and suggested that he should inquire to

find out if it was too late to obtain the coverage.  (Doc. 30-3 at 86)  Plaintiff claims that Level then

remarked, "Might as well, because he don't do shit anyway." Id.  Plaintiff does not recall when this

conversation occurred other than to say it was on the day the Aflac person was on site.  Id.  Plaintiff

claims also that Level made "other sly remarks," and remarks about Plaintiff "not doing nothing or me

being basically sorry, you know," but he could not recall any specifics of what Level said.  Id.  Finally,

though he indicated at his deposition he remembered no other comments, in Plaintiff's declaration

opposing this current motion, Plaintiff claimed to recall an incident when, while he was on his break,

Level made a comment that he had watched Plaintiff for 15 minutes and had noted Plaintiff had not

done anything during that period. (Doc. 30-3 at 114)  In addition, he recalled Level making a

comment—though he could not remember what Level said—about Plaintiff being "sorry."[6]  Id. at 115.

## II.    Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is

"no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial

summary judgment, when there is no genuine issue of material fact as to a particular claim or portion

of that claim.  Fed. R. Civ. P. 56(a); *see also* Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir.

1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination,

even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply

on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R.

Civ. P. 56 (a), (c); Mora v. Chem-Tronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

---

[6] Plaintiff does not clarify whether this is occurred on a different occasion than the one described at his deposition.

1    Summary judgment, or summary adjudication, should be entered "after adequate time for

2    discovery and upon motion, against a party who fails to make a showing sufficient to establish the

3    existence of an element essential to that party's case, and on which that party will bear the burden of

4    proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the "initial

5    responsibility" of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at

6    323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find

7    for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the

8    governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Wool v. Tandem

9    Computers, Inc., 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is

10   appropriate by "informing the district court of the basis of its motion, and identifying those portions of

11   'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits,

12   if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex, 477

13   U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

14   If the moving party meets its initial burden, the burden then shifts to the opposing party to

15   present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e);

16   Matsuhita, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some

17   metaphysical doubt as to the material facts."  Id. at 587.  The party is required to tender evidence of

18   specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention

19   that a factual dispute exits.  Id. at 586 n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not

20   required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed

21   factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth

22   at trial." T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir.

23   1987).  However, "failure of proof concerning an essential element of the nonmoving party's case

24   necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

25   The Court must apply standards consistent with Rule 56 to determine whether the moving party

26   demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law.

27   Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary

28   judgment, the Court can only consider admissible evidence.  Orr v. Bank of America, NT & SA, 285

1  F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); <u>Beyene v. Coleman Sec. Servs., Inc.</u>, 854

2  F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the

3  nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. <u>Orr</u>,

4  285 F.3d at 772; <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).

5  **III.    Plaintiff's Claims**

6        **A.    Disability discrimination in violation of FEHA**

7        In his first cause of action, Plaintiff claims Defendant discriminated against him by "harassing

8  Plaintiff, writing up Plaintiff and then terminating Plaintiff's employment" after he suffered a

9  disabling injury.  (Doc. 1-1 at 7)  Plaintiff alleges these acts violated California Government Code §

10  12940(a).  Under this section, an employer is liable where it takes adverse employment action based

11  upon the employee's physical disability.

12        The test developed in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), applies to

13  FEHA discrimination claims. <u>Guz v. Bechtel Nat. Inc.</u>, 24 Cal.4th 317, 354 (2000). Under this three-

14  part test, first Plaintiff must establish a prima facie case. <u>Id</u>.  To succeed on his claim for disability

15  discrimination, a plaintiff must show, "(1) he suffers from a disability; (2) he is otherwise qualified to

16  do his job; and, (3) he was subjected to adverse employment action because of his disability."  <u>Faust v.</u>

17  <u>California Portland Cement Co.</u>, 150 Cal.App.4th 864, 886 (2007).

18        If Plaintiff makes this showing, the burden shifts to Defendant to establish a legitimate reason

19  for the adverse employment action. <u>Guz</u>. at 355.  If this occurs, Plaintiff must show the reasons stated

20  by Defendant are a pretext for discrimination. <u>Id</u>. Thus, Plaintiff has "the ultimate burden of persuading

21  the trier of fact that the defendant intentionally discriminated against [him]." <u>Reeves v. Sanderson</u>

22  <u>Plumbing Products, Inc</u>., 530 U.S. 133, 142 (2000).

23        **i.    It appears Plaintiff can establish his prima facie case**

24        In this motion, there is no dispute Plaintiff suffered a qualifying disability and that MCT

25  terminated him.  However, Defendant claims that Plaintiff cannot prove he was terminated because of

26  his disability. (Doc. 27 at 7)  Defendant offers little argument for this position and relies on the

27  evidence detailed above related to the numerous "write-ups" MCT gave to Plaintiff, which do not

28  mention Plaintiff's disability. <u>Id</u>.  However, Plaintiff claims that the discipline MCT imposed for

removing the blue flag violation, for placing his hand in the running engine in August 2012 and for failing to wear the hardhat were contrived and unsupported by MCT policy.  (Doc. 20 at 20-22)  Because Plaintiff has only a slight burden when establishing the prima facie case (Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994)) and Defendant fails to address these rebuttal arguments as to causation[7], the Court will assume without deciding, this element is shown.

However, Defendant squarely disputes that Plaintiff was otherwise qualified to do his job and does not address whether he can present evidence that his firing was due to his disability.  Rather, Defendant argues Plaintiff was not qualified to do his job because MCT cited him for having committed numerous safety violations.  (Doc. 27 at 3-8)  Defendant relies upon the five times Plaintiff was found to be deficient at his job before the March 6, 2012 injury.  (JUF 14, 15)  MCT also relies upon the fact that Plaintiff suffered the injury due to "carelessness." (JUF 16; Doc. 25-5 at 1-2)  Finally, MCT relies upon the discipline MCT imposed on Plaintiff after he returned from medical leave in August 2012.  (JUF 16, 17 [disciplined for again reaching into a running engine]; JUF 19, 24 [disciplined for causing damage to a company toolbox and failing to report it]; JUF 23 [disciplined for removing a blue flag warning despite lack of clarity as to whether it should be removed]; JUF 24 [disciplined for failing to wear a hard hat while driving a fork lift]; JUF 21, 22 [receiving poor performance evaluation due, in part, to safety concerns])

However, while recognizing that the prima facie case requires Plaintiff to demonstrate he was qualified for the job *despite his disability*, Defendant ignores that none of the citations of poor workmanship or safety violations related to his disability.  Rather, Defendant focuses on cases that interpret the Americans with Disabilities Act, which expressly notes that a disabled person is qualified unless he "pose[s] a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).  Notably, the ADA considers this failure of qualification to be a *defense* to the ADA action, *not an element of the prima facie case*.

FEHA requires Plaintiff to demonstrate in his prima facie case, that he is able "to perform his … essential duties even with reasonable accommodations" and that he can "perform those duties in a

---

[7] "A defendant can meet the [burden of showing the plaintiff has not established a prima facie case] merely by showing the absence of evidence of discrimination. But that is not enough. The defendant must also show, by direct or circumstantial evidence, that the plaintiff cannot reasonably expect to obtain a prima facie case." Guz, 24 Cal.4th at 374.

1  manner that would not endanger his or her health or safety or the health or safety of others" despite his
2  disability.  Cal. Gov. Code 12940.  Notably, the instances described above do not demonstrate that
3  Plaintiff *could not* perform the duties despite his disability; instead, they demonstrate he *did not*
4  perform the duties of his job regardless of this disability.

5       Unlike the cases cited by Defendant interpreting the ADA, this is not a situation where Plaintiff
6  suffered uncontrolled panic attacks which made him unmindful, where he had monocular vision which
7  impaired his driving skills such to place himself and company property at risk or where he suffered an
8  emotional or developmental defect that made him unable to bear the responsibility of paying heed to
9  safety issues.  Rather, Plaintiff was careless and, though his carelessness may be grounds for
10 termination, it does not demonstrate he was not qualified to perform the job duties despite his injury.
11 Indeed, despite repeated safety violations and poor performance, MCT *continued* to maintain
12 Plaintiff's employment until the final incident.

13             **ii.    Defendant has shown a legitimate, non-discriminatory for firing Plaintiff**

14      Once Plaintiff establishes a prima facie case, the burden shifts to Defendant to demonstrate "to
15 articulate some legitimate, nondiscriminatory reason for the challenged action." Hawn v. Executive Jet
16 Mgmt., Inc., 615 F.3d 1151, 1155 (9th Cir. 2010).  Under FEHA, a defendant must identify "reasons
17 that are facially unrelated to prohibited bias," but the articulated reasons "need not necessarily have
18 been wise or correct."  Guz, 24 Cal.4th at 358.

19      Defendant relies upon the discipline imposed on Plaintiff as evidence of its legitimate business
20 reason for terminating Plaintiff.  First, the Court notes that none of the employee "write ups"
21 concerned Plaintiff's injured hand.  Second, there is no dispute that each incident occurred and,
22 indeed, Plaintiff admitted at his deposition that the performance issues before his injury were unrelated
23 to discrimination. (Doc. 30-3 at 88-89)  The questioning went as follows:

24      Q.    Why do you think -- and I want your opinion. Why do you think DeMon
              had an issue or a problem with you? Because that's what I -- I believe
25            you're saying with respect to your allegations in this case.

26      A.    I think he -- I think he felt like I did this on purpose. That's my personal
              opinion. I think he felt -- and let me say this: I would not do this on
27            purpose if I was trying to get a lawsuit or something against anybody or
              anything like that. I'm not going to injure myself for some money or
28            whatever he thought it was.  So I think he actually thought I did this on
              purpose.

Q. Are you claiming, then, that all the write-ups that you had and the discipline and the counseling were because of that -- your hand injury?

A. Well, most of the write-ups is before I got injured.

Q. That's what I'm saying. There's a lot of write-ups before you got injured?

A. **No -- yes. And that had nothing to do with my hands because my hand wasn't injured at the time, so it had nothing to do with the hand.**

Q. **So you don't think this discipline -- write-up and the discipline that you've gotten from DeMon had -- has to do with your hand or your injury?**

A. **At that -- at that time, no, because I was not injured.**

Id. emphasis added.

These incidents caused Level and his supervisor, Jacques Clerc, to be significantly dissatisfied with Plaintiff's work performance *before his injury*. (Doc. 25-11 at 1-2)  When reporting to his superior, Kurt White, Clerc expressed that, "I talk with DeMon every week.  I keep hearing the same issues [regarding Plaintiff's work performance] with no end in sight." Id. at 1.  Level reported, "Tommy continues to make the same mistakes on equipment as well as paperwork.   I have continued to address and put a correction/action plan in place, but the errors continue . . . If I was scratching my name across the bottom of the check, would I be satisfied with my investment? . . . The answer . . . would be no." Id.  Both Clerc and Level felt Plaintiff "was not a good fit for our team" and that "if you want a quality technician he isn't it." Id. at 1-2.  Notably, it was Kurt White—Clerc's supervisor—who decided Plaintiff would not be fired at that time.  (Id. at 1)  White instructed, "Jacques please call [Plaintiff] and make him aware of what exactly he needs to improve on. We need accurate measurable criteria, then decide the time line and hold to it. If he improves fantastic, if not then so be it." Id.

Given this evidence, the Court finds Defendant has demonstrated a legitimate, non-discriminatory business reason for Plaintiff's termination.

### iii.   Plaintiff fails to demonstrate Defendant's actions were a pretext for discrimination

Because Defendant has demonstrated a legitimate reason for firing Plaintiff, the burden shifts

1   to Plaintiff to demonstrate Defendant's stated business reason is pretext for discrimination.  Plaintiff is

2   obligated to demonstrate there is a "triable issue of material fact as to whether the defendant's

3   proffered reasons . . . are mere pretext." See Hawn, 615 F.3d at 1155-56. "A plaintiff can show pretext

4   directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing

5   that the employer's explanation is unworthy of credence."  Vasquez v. County of Los Angeles, 349

6   F.3d 634, 641 (9th Cir. 2003); see also Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094-95 (9th

7   Cir. 2005).  Direct evidence typically consists of retaliatory statements or actions by the employer.

8   Coghlan, 413 F.3d at 1095.  Indirect evidence "requires an additional inferential step."  Id.

9        Plaintiff argues, without citation to evidence, that once he returned to work after his injury,

10   MCT had decided to fire him due to his disability and contrived reasons to do so that would not appear

11   to be discriminatory.  (Doc. 29 at 20-22)  Plaintiff argues that when he put his hand in the engine the

12   second time—after returning to work in August 2012—he did so because that was how he had been

13   trained by Adrian Castillo.  Id. at 21. Notably, his training with Castillo and Level occurred for a couple

14   of weeks after his hiring in late 2011 (Doc. 30-3 at 5-6) and was before he was explicitly instructed in

15   March 2012—after suffering the severe injury due to putting his hand in a running engine—not to put

16   his hand in a running engine again.  (JUF 16)

17        In addition, as to the damaged toolbox, Plaintiff argues that Level's claim that Plaintiff told

18   him one version of the events but Plaintiff later wrote a different version of the events on the "write-

19   up," is evidence that Level acted with discriminatory animus.  Plaintiff argues this must be the case

20   because Level didn't witness Plaintiff damaging the toolbox.  However, Level never claimed he did.

21   Rather, he claimed Plaintiff reported to him two different versions of what occurred: one in which

22   Plaintiff's actions were more egregious and one in which they were less so.  The fact that Level chose

23   to believe the account that painted Plaintiff in a worse light is not evidence of discriminatory animus.

24        In any event, as noted above, here the Court has accepted Plaintiff's version of what occurred,

25   and reason dictates that Plaintiff's action were worthy of discipline.  The employee handbook

26   informed employees that negligent care and use of company property could result in discipline.  (Doc.

27   25-2 at 30)  Moreover, Plaintiff took a safety quiz at the onset of his employment which indicated his

28   understanding that failing to secure property before moving a vehicle constitutes a safety issue.  (Doc.

25-4 at 3)  The quiz read, "Give examples of times when your focus on safety was not there and the results that ensued. <u>Id</u>.  In response, Plaintiff wrote, "Did [not] look around vehicle before moving it. A ladder fell." <u>Id</u>.  The next question read, "How did that change your behavior?"  <u>Id</u>.  In response, Plaintiff wrote, "Made me insure that everything is clear and/or secure before moving vehicle." <u>Id</u>. Thus, the fact that Plaintiff *now* thinks that his action in failing to secure the property before moving vehicle does not constitute a safety violation is unsupported.

Plaintiff argues that he should not have been disciplined for removing the blue flag because personnel commonly removed blue flags that they did not personally install.  (Doc. 20 at 22) However, this argument misses the point.  For purposes of this motion, the Court accepts as true that Plaintiff was permitted to remove the blue flag even if he did not personally install it.  However, the Court is mindful that there is no evidence that Plaintiff was entitled to remove a blue flag if it was not safe to do so.

Thus, at issue is whether MCT acted in a discriminatory fashion when it disciplined Plaintiff for removing the blue flag <u>in this instance</u>; the Court concludes MCT did not.  First, Plaintiff's claim that the communication with Level clearly meant that Level authorized him to remove the blue flag is unreasonable.  When this "communication" occurred, Plaintiff had just finished replacing a fan belt.  It was just as likely that the "thumbs up" gesture Level made after Plaintiff completed this work and yelled "We good?" was a verification that there was no more work for Plaintiff to do, rather than constituting the clear, unambiguous affirmation that Level wanted the blue flag protection removed, as Plaintiff claims.  Rather, the fact that Level returned to atop the railcar most emphatically demonstrates that *he did not want* the blue flag protection removed.  Where, in circumstances like here, a wrongfully removed blue flag could get a person killed, it was patently unreasonable for Plaintiff to conclude that he was justified in removing the blue flag when he based his decision to do so on a few hand gestures and an inquiry of "We good?" It is equally unreasonable to conclude that the grounds for his discipline claimed only that he removed a blue flag he did not install.  Indeed, the written discipline does not make this claim[8] but prohibits Plaintiff from removing a blue flag in the future that he did not personably install.  (Doc. 30-3 at 95)

[8] Though Level makes this claim (Doc. 25 at 6), Clerc contradicts this.  (Doc. 30-3 at 92)

13

1    Even still, Plaintiff argues that the fact Level claims an employee may not remove the blue flag

2    placed by another and the fact that he claimed to have given the written disciplinary form to Plaintiff

3    in January rather than October, means that Level contrived the whole scenario.  (Doc. 20 at 22)

4    Plaintiff claims this demonstrates that Level expressly told Plaintiff to remove the blue flag and then

5    jumped back on the railcar—despite his awareness of the approach of the locomotive to move the

6    car—in order to have grounds for disciplining Plaintiff  for removing the blue flag.  Id.  However,

7    Plaintiff presents no evidence to support this assertion and the inferences from the evidence that he

8    does present fails to lead to this conclusion. While "fundamentally different justifications for an

9    employer's action . . . give rise to a genuine issue of fact with respect to pretext since they suggest the

10   possibility that neither of the official reasons was the true reason" Washington v. Garrett, 10 F.3d

11   1421, 1434 (9th Cir.1994), here, the fact that the discipline form submitted by Plaintiff differs from the

12   one offered by Defendant, though strange, does not demonstrate different justification for the action.

13   Instead, the one offered by Defendants (Doc. 25-16) is much more comprehensive than the one offered

14   by Plaintiff (Doc. 30-3 at 95-98) and details the prior incidents.  The reason for underlying reason for

15   the discipline did not change.

16   Finally, Plaintiff presents no evidence that any other employee ever removed a blue flag in

17   circumstances where the authorization to do so was ambiguous.  Likewise, he presents no evidence

18   that there have been other employees who removed a blue flag prematurely who MCT did not

19   discipline.  Thus, the Court finds that Plaintiff's bare claim that this discipline was an act of

20   discrimination is insufficient to demonstrate the reasons stated for Plaintiff termination were pretext.

21   Likewise, Plaintiff argues he should not have been disciplined for failing to wear the hardhat

22   while operating the forklift.  While he admits his training detailed that he was supposed to wear a

23   hardhat while on railroad property (Doc. 25-4), Plaintiff claims that the practice was that employees

24   were not required to wear one where he was working at the time and not while operating the forklift.

25   (Doc. 20 at 22)  Thus, he claims because MTC disciplined him improperly for this event, this

26   demonstrates his termination was due to discrimination.

27   Admittedly, there are disputes of fact as to whether Plaintiff was entitled to not wear a hardhat

28   based upon his location and/or the type of equipment he operated.  However, FEHA

14

does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. The FEHA addresses discrimination. It is not a shield against harsh treatment at the workplace. Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is whether the given reason was a pretext for illegal discrimination.

Arteaga v. Brink's, Inc., 163 Cal.App.4th 327, 344 (2d Dist. 2008). The fact that Plaintiff may not have been deserving of discipline related to the hardhat incident does not mean, without more, that the reason for the discipline was discrimination. "A mere failure to follow formal internal policies does not support a discrimination claim." Guz, 24 Cal.4th at 377. Nothing in the language of the discipline notice or the circumstances giving rise to it raises any inference that it was motivated by his disability or work restriction.

Moreover, the fact that Plaintiff was terminated within a week of returning to work in January 2013 does not establish discriminatory animus. While this temporal proximity to his return could "infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion," (Sandell v. Taylor–Listug, Inc., 188 Cal.App.4th 297, 310 (2010)), Defendant offers significant explanation that the motivation for Plaintiff's termination began to be generated nearly a year before.

Nevertheless, at the hearing, Plaintiff's counsel argued that Level required him to work beyond his work restrictions and made several comments that Plaintiff "doesn't do shit," that he was worthless and that he hadn't done anything for 15 minutes as evidence that his firing was because of his disability. As to this latter comment, Plaintiff explained that he was on a break at the time. (Doc. 30-3 at 114) Whether there was reason for Level to know this, is not shown. However, none of the comments referenced Plaintiff's disability in any way. Likewise, Plaintiff could not recall the timeframe when Level made these statements. (Doc. 30-3 at 86)

Though counsel argued that, for a disabled person, these comments clearly would mean they were directed at the disability, this argument is unsupported by evidence or reasonable inference. On the other hand, as noted above, as early as February 2012, Level felt that Plaintiff was not earning his pay. Plaintiff fails to explain—or cite to legal authority—that comments made after an injury translate

15

1     into discrimination when the animosity pre-existed the injury.  Thus, the Court concludes these

2     isolated and "'stray' remarks are insufficient to establish discrimination" without other indicia of

3     discriminatory intent. Merrick v. Farmers Ins. Group, 892 F.2d 1434, 1438 (9th Cir.1990). As the

4     Ninth Circuit observed in Merrick, "remarks ... when unrelated to the decisional process, are

5     insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements

6     are made by the decision-maker in issue." Id. quoting Smith v. Firestone Tire & Rubber Co., 875 F.2d

7     1325, 1330 (7th Cir.1989).

8          Toward the goal of establishing discriminatory animus, Plaintiff relies upon an e-mail sent by

9     an MCT human resources person—a month after Plaintiff was fired—which, he claims, demonstrates

10    that MCT acted with discriminatory animus.  (Doc. 30-3 at 117)  The e-mail reads,

> Update on Tommy Coleman.  We terminated him for multiple safety violations.  We
> were well planned, managed, and documented which is in our favor currently.  We will
> see a verdict for our submission of all benefits to be dropped including his disability
> benefits.  Tommy was able to work and not willing.  Then he went back to work after
> our continued diligence, and was a huge safety hazard, in which, cause his termination.
> Therefore, Tommy is capable of working and not working and in CA if you are capable
> of working you don't get continued disability benefits.  He was also terminated at his
> fault so unemployment is not an option.  We will have verdict by EOB today.

16    Id.  Plaintiff contends this demonstrates that MCT manufactured the circumstances that lead to his

17    firing.[9]  Notably, however, though Plaintiff argues he should not have been disciplined for the events

18    that led to his firing, he does not claim that the events did not occur.  Though he offers after-the-fact

19    explanation for the events, the statements he made at the time control.  See Scheller v. Am. Med.

20    Response, Inc., 2010 WL 2991508, at *10 (E.D. Cal. July 28, 2010) ["a party cannot create an issue of

21    material fact by providing a self-serving declaration which contradicts that party's earlier deposition

22    testimony necessitating a choice between the nonmoving party's two conflicting versions."]

---

[9] The Court does not agree.  First, there is no showing that the author of the e-mail had any role in the termination decision.  Rather, Level asserts that the decision was made by him and Kurt White.  (Doc. 25 at 7)  Second, apparently, the claim for further disability payments—after the firing—was in progress and a determination on the merits of that claim was due on the day of the writing of the message.  Clearly, the e-mail represents the opinion of the author as to the likelihood that Plaintiff would prevail on his claim for disability and unemployment benefits after he had been fired.  Third, the statement is consistent with the February 2012 statement of Kurt White—before Plaintiff suffered his injury—that the firing must be based upon "accurate measurable criteria." (Doc. 25-11 at 1-2)  Finally, there is no showing that the author was aware of Plaintiff's employment situation before his firing or any of the bases upon which the firing decision was made before the termination occurred.  Thus, when evaluated in its context, the meaning Plaintiff attributes to this e-mail raises, at most, a metaphysical doubt as to Defendant's motives.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

1       For example, though Plaintiff now claims he was trained to put his hand in a running engine,

2   he admits that when he was injured he was expressly told not to do this again.  Nevertheless after

3   returning to work he did it again and at the time admitted that doing so was "was careless of me.  It

4   won't happen again."  (Doc. 25-13 at 1, 3) At his deposition, he claimed that he wrote this "to keep the

5   peace" but, even still, did not disagree that placing his hand in the running engine was careless.  When

6   asked, "So you agree that that was a careless thing that you did on that incident?" he responded, "Not

7   totally . . ."  (Doc. 30-3 at 59)

8       When he was disciplined for removing the blue flag protection, he admitted at the time that he

9   misunderstood the communication with Level and in the future, he would "make sure we're on the

10  same page."  (Doc. 30-3 at 96)  Likewise, when MCT disciplined Plaintiff for damaging the toolbox,

11  he did not dispute that he caused the damage, that he failed to report the damage or that the damage

12  was caused by his carelessness. (Doc. 25-14 at 1, 3)  Finally, when MCT gave him the extremely

13  negative performance review, he did not dispute the comments made by his supervisor but, instead,

14  reported, "I will work on improving my performance and quality of work."  (Doc. 25-15 at 3; JUF 22)

15  The fact that he now claims that he made this statement and admitted carelessness on prior events, "to

16  keep the peace," flatly contradicts his earlier admission and the two positions cannot be squared.

17      Plaintiff does not take the position there is any direct evidence of discrimination.  Rather, he

18  argues there is indirect circumstantial evidence of it.  Substantial and specific evidence is required for

19  Plaintiff to meet his burden to demonstrate pretext. Aragon v. Republic Silver State Disposal Inc., 292

20  F.3d 654, 661 (9th Cir. 2002), as amended (July 18, 2002).  Because the Court finds he has not

21  presented this type of evidence, the Court finds Plaintiff has failed to meet his burden and Defendant

22  motion or judgment is **GRANTED**.

23      **B.      Failure to prevent discrimination and harassment in violation of FEHA**

24      In his second cause of action, Plaintiff claims Defendant failed to take reasonable steps to

25  prevent discrimination and to investigate unlawful discrimination in violation of California

26  Government Code § 12940(k). (Doc. 1-1 at 8)  This section requires an employer "to take all

27  reasonable steps necessary to prevent discrimination and harassment from occurring." To succeed on

28  this claim, Plaintiff must establish "(1) [he] was subjected to discrimination, harassment or retaliation;

1    (2) defendant  failed to take all reasonable steps to prevent discrimination, harassment or retaliation;

2    and (3) this failure caused plaintiff to suffer injury, damage, loss or harm." Leland v. City & Cnty. of

3    San Francisco, 576 F.Supp.2d 1079, 1103 (N.D.Cal.2008).

4            Because Plaintiff has failed to demonstrate he suffered disability discrimination, summary

5    judgment on this cause of action is **GRANTED**.

6            **C.      Retaliation in violation of FEHA**

7            In his third cause of action, Plaintiff claims Defendant retaliated against him by requiring him

8    to work beyond the restrictions imposed by his doctor, reprimanding him, refusing to provide

9    reasonable accommodation and terminating him.  (Doc. 1-1 at 9)  He asserts that he complained to

10   Kurt White a few days before he returned to work in January about Level's requiring Plaintiff to work

11   beyond his restrictions in the past.  When asked whether he ever complained about anyone failing to

12   accommodate him, he stated, "I don't know if this would be considered accommodation, but when

13   Kurt asked me to come back in January I -- him and Cassie was on the phone and I specifically said,

14   "Speak to DeMon about what I got" – "the work I need to do because, you know, he" – "he seems to

15   not care or, you know, blow it off," or whatever his rationale is as far as my work restrictions is

16   concerned. And he told me, "Well, I'll make sure of that."  (Doc. 30-3 at 85)  Plaintiff claims these

17   acts violated California Government Code § 12940(h).

18           The McDonnell Douglas shifting-burdens test applies to claims of retaliation as well.  However,

19   to establish the prima facie case, Plaintiff "must establish: (1) a protected activity; (2) an adverse

20   employment action; and (3) a causal link between the protected activity and the adverse employment

21   action." Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1035 (9th Cir. 2006). Causation may

22   be demonstrated where the alleged retaliatory employment decision occurred within a sufficiently close

23   time after the protected activity.  Id.

24           As noted above, Defendant has demonstrated that MCT's firing decision was based upon a

25   legitimate business reason and not due to discrimination.  Further, Plaintiff has failed to demonstrate

26   this reason was pretext for discrimination.  Thus, this claim fails and Defendant's motion in this regard

27   is **GRANTED**.

28   ///

18

1         **D.**      **Failure to accommodate Plaintiff's disability and failure to engage in the**

2    **interactive process in violation of FEHA**

3         In his fourth and fifth causes of action, Plaintiff claims Defendant failed to provide him

4    reasonable accommodation after he suffered the disabling injured and failed to engage in the interactive

5    process.  (Doc. 1-1 at 9-10)  "Under the express provisions of the FEHA, the employer's failure to

6    reasonably accommodate a disabled individual is a violation of the statute in and of itself." Jensen v.

7    Wells Fargo Bank, 85 Cal.App.4th 245, 256 (2000); Cal. Gov. Code § 12940(m). "Similar reasoning

8    applies to violations of Government Code section 12940, subdivision (n), for an employer's failure to

9    engage in a good faith interactive process to determine an effective accommodation, once one is

10   requested." Gelfo v. Lockheed Martin Corp., 140 Cal.App.4th 34, 54 (2006).  "[A]n employer's duty to

11   accommodate is inextricably linked to its obligation to engage in a timely, good faith discussion with

12   an applicant or employee whom it knows is disabled, and who has requested an accommodation, to

13   determine the extent of the individual's limitations, before an individual may be deemed unable to

14   work." Id. at 61.

15        To succeed on either claim, a plaintiff must establish, "(1) the plaintiff has a disability covered

16   by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential

17   functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's

18   disability." Wilson v. County of Orange, 169 Cal.App.4th 1185, 1192 (2009).

19        **i.**      **The interactive process in violation of FEHA**

20        Here, MCT addressed Plaintiff's physical condition by providing a modified, light duty job

21   description.  The modified job description notes that Plaintiff was limited to lifting 20 pounds.  (Doc.

22   25-12 at 1-2)  In addition, it notes that Plaintiff would be permitted to do only "minimal" repairs on

23   refrigeration units, "For example, fill oil, coolant, turn on unit and run pretrip." Id.  Plaintiff admits

24   this repair work complied with his doctor's limitations.[10] (Doc. 26-1 at 8-9)  The modified job

25   description further specified, "No other repairs will be allowed."  (Doc. 25-12 at 1-2)

26        Plaintiff argues this modified job description was insufficient because it failed to address the

27

28   _____
    [10] Likewise, he admits that he was able to drive. (Doc. 26-1 at 12)

restriction that Plaintiff could use his left hand only in a "limited" fashion.  (Doc. 29 at 27)  However, the job description expressly notes, "General Description: Performs restricted duty assignments within the weight and/or physical limitations prescribed by a provider . . . Special Limitations: The provider's release attached is made part of this light duty job description, and is to be strictly followed."  Id.  Plaintiff does not claim that he objected at the time to the modified light duty job description as being inconsistent with the doctor's restrictions because it failed to note "limited" use of his left hand or on any other grounds.

Here, MCT never determined Plaintiff was unable to work and, in fact, developed a light duty, modified job description that incorporated the restrictions imposed by Plaintiff's doctor.  Defendant has met its burden of establishing it engaged in the interactive process, and Plaintiff has failed to rebut it.  Thus, Defendant's motion is **GRANTED** as to the fourth cause of action.

### ii.     Reasonable accommodation

Plaintiff argues he was forced to do work that required heavier lifting than that authorized by his doctor and involved use of his left hand in excess of the "minimal" amount permitted.  He argues that on six occasions he was required to do work that was prohibited by his doctor's restrictions.  (Doc. 35 at 1-4, PUDF 33-37)  He claims, for example, he was required to lift receivers, compressors and batteries that weighed at least 45, 100 and 48 pounds, respectively.  (PUF 33-35, 37) Plaintiff asserts that DeMon Level required him to repair a water pump and that this required more than limited use of his left hand. (PUF 36)  Though Defendant disputes that Plaintiff was required to work beyond his restrictions, Plaintiff has met his burden of demonstrating a dispute of fact.

On the other hand, MCT argues that these disputed facts are not material to the Court's determination here because Plaintiff is the cause of the failure of the accommodation by not engaging in the interactive process.  Presumably, MCT is arguing that Plaintiff was obligated to alert MCT that he was being asked to work beyond his restrictions.  However, Plaintiff *did* testify to doing this.  Plaintiff testified he complained to DeMon Level and another supervisor, Adrian Castillo.  (Doc. 35 at 4, PUF 38)  Finally, Defendant argues there is no evidence that, if he was required to work outside of his restrictions, that Plaintiff suffered damage as a result.  (Doc. 37 at 19)  However, Defendant has failed to point the Court to where in the record Plaintiff's lack of damage is documented.  Rather, it

1  appears to the Court that Defendant failed to address this element in its motion.  Thus, because there is

2  a question of material fact, Defendant's motion as to the fifth cause of action is **DENIED**.

3        **E.**      **Wrongful termination in violation of FEHA**

4        In his sixth cause of action, Plaintiff claims Defendant fired him because he was disabled.

5  Plaintiff contends his firing was an act of discrimination in violation of public policy preventing such

6  action. (Doc. 1-1 at 11)  FEHA's prohibition against racial and disability discrimination may form the

7  basis of a wrongful discharge in violation of public policy claim. Because Plaintiff has failed to

8  demonstrate he suffered disability discrimination (De Horney v. Bank of America Nat'l Trust & Sav.

9  Assoc., 879 F.2d 459, 465 (9th Cir.1989); Esberg v. Union Oil Co., 28 Cal.4th 262, 272 (2002))

10 summary judgment on this cause of action is **GRANTED**.

11 **ORDER**

12       For the reasons set forth above, the Court **ORDERS:**

13       1.      Defendant's motion for summary judgment is **GRANTED** as to the first, second, third,

14 fourth and sixth causes of action;

15       2.      Defendant's motion for summary judgment is **DENIED** as to the fifth cause of action.

16

17 IT IS SO ORDERED.

18   Dated:   **September 2, 2015**          **/s/ Jennifer L. Thurston**

19                            UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28